IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| KAREN BRADSHAW, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:11-CV-640-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF THE SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order of Transfer*, dated April 25, 2011, this case has been transferred for all further proceedings and entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 22, 2011 (doc. 21), and *Defendant's Motion for Summary Judgment*, filed August 22, 2011. (doc. 23.) Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner.

**I. BACKGROUND**[2]

**A. Procedural History**

Plaintiff Karen Lorraine Bradshaw ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and XVI of the Social Security Act. (R. at 19-20.) On March 21, 2007, Plaintiff filed

---

[2] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

applications for disability insurance benefits and supplemental security income, alleging disability since May 13, 2005, due to high blood pressure, diabetes, a brain tumor, and panic disorder. (R. at 96-105, 162.) Her application was denied initially and upon reconsideration. (R. at 46-51, 56-59.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 66.) She personally appeared and testified at a hearing held on September 24, 2008. (R. at 23-41.) On December 12, 2008, the ALJ issued a decision finding her not disabled. (R. at 12-20.) Plaintiff appealed, and the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on August 8, 1957. (R. at 26.) She has a high school degree and past relevant work as a dietary clerk and caregiver. (R. at 27.)

    **2.     Medical Evidence**

On May 13, 2005, Plaintiff was taken to the emergency room with an altered mental status. (R. at 754.) She was unable to provide any medical history and was quite confused and disoriented. (*Id*.) Her husband stated that he found her heating paper towels in the oven thinking that she was warming TV dinners for her child. (*Id*.) He also stated that she had been behaving strangely for two weeks prior to that incident. (*Id*.) Upon examination, she was noted to have a 4 x 6 centimeter dural-based tumor in the left frontal lobe of her brain consistent with Meningioma. (*Id*.) Richard H. Jackson, M.D., the neurosurgeon on call, adjusted her diabetic and hypertensive medications and started her on Dilantin and Decadron to treat her cerebral edema and possible seizure disorder. (*Id*.)

Plaintiff developed a fever and was taken off the Dilantin. (*Id.*) Dr. Jackson noted that Plaintiff's mental status gradually cleared over several days on the Decadron and she became lucid and coherent. (*Id.*) She became ambulatory, was able to self dress and groom, and was noted to have good judgment. (*Id.*)

On May 25, 2005, Plaintiff underwent a craniotomy to remove the large dural-based tumor. (R. at 754.) The tumor arose from the frontal and anterior cranial fossa dura and eroded a small hole in the posterior wall of the frontal sinus. (*Id.*) The tumor was removed and found to be benign. (*Id.*) The surgeon had to pack off both the left frontal sinus that was invaded by the tumor and the craniotomy opening. (*Id.*) After the surgery, Plaintiff's neurological status was found to be normal. (*Id.*) On May 29, 3005, Plaintiff was ambulatory, on a regular diet, had minimal pain, and was cleared for discharge from the hospital. (*Id.*)

On June 16, 2005, Plaintiff had a CT scan of her head that was interpreted by David Kilgore, M.D. (R. at 327-28.) Dr. Kilgore noted that the scan showed a left frontal craniotomy site with the bone flap in good position. (R. at 327.) He observed that a very small amount of air had persisted in the tumor bed since the brain surgery three weeks earlier and noted that it was somewhat unusual for air to persist that long. (*Id.*) He determined that the air was most likely related to the synthetic dural patch substitute and sealant placed at the site of tumor resection. (*Id.*)

On July 3, 2005, an evaluation showed low attenuation in the left frontal lobe suggestive of mild edema. (R. at 289.) Plaintiff reported daily severe headaches, nausea, vomiting, and diarrhea. (R. at 283), and rated her headaches as a 10 on a 10 point scale. (R. at 291.)

On July 26, 2005, Plaintiff again rated her headaches as 10 on a 10 point scale. (R. at 266.) Postoperative findings showed a 3x4 centimeter area of cerebral softening and fluid collection over the craniotomy flap. (R. at 318.)

On May 2006, Plaintiff returned to the ER with severe headaches. (R. at 252.) She rated the pain as 9 out of 10 stated that it was constant but worsened with movement. (*Id.*) She was also in tears, stating that she was depressed. (R. at 337.) She was subsequently placed on Zoloft. (R. at 248.) Although Plaintiff continued to experience severe headaches, she also began suffering from extreme chest and abdominal pain and continued to experience nausea. (R. at 241, 244, 410, 412.) Plaintiff continued to experience constant, severe headaches, fever, cough with streaks of blood, vomiting, trouble breathing, and depression. (R. at 238, 341-42, 581, 585.)

On June 30, 2006, John Ferguson, Ph.D., a non-examining medical consultant assessed Plaintiff's RFC and opined that she was moderately limited in her ability to understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (R. at 522-23.) He also found that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. at 522.)

In May 2007, Jeffrey Siegel, Ph.D., a state forensic and clinical psychologist, stated that Plaintiff was anxious, tearful and depressed, and had several large bruises on her arms and shoulders resulting from her husband's abuse. (R. at 477.) Dr. Siegel opined that Plaintiff had mood disorder with depressive features due to left frontal craniotomy and that she had a GAF of 42. (R. at 479.) Plaintiff told him that she was seeking disability benefits due to significant stress, panic attacks, daily headaches, unwillingness to leave home, and significant medical impairments following brain surgery. (*Id.*)

Plaintiff fell and hit her head in June and was knocked out for one to two hours and awakened in the ER. (R. at 552.) A week later, she was the victim of an aggravated assault when she was thrown against a wall. (R. at 492, 494.) This resulted in a concussion, increased headaches, and blood and white flecks in her urine. (R. at 492, 495.) Doctors later noted that she was not doing well, her front tooth had cracked and fallen out, and she had increased back pain. (R. at 893.)

On June 2, 2007, Kokila Thirumarthi, D.O., examined Plaintiff. (R. at 855.) Plaintiff reported that she had been diagnosed with a benign tumor that was removed in 2005, and that she had diabetes and hypertension. (R. at 856.) She also reported that she could do all of her activities of daily living. (R. at 857.) Dr. Thirumarthi observed that Plaintiff was not using an assistive device and she was able to get on and off the examining table without difficulty. (*Id.*) He also noted that she was able to stand on her heels and toes without difficulty. (*Id.*)

On June 12, 2007, John Ferguson, PhD, completed a psychiatric review of Plaintiff and opined that she had affective disorders and coexisting non-mental impairments that required referral to another medical speciality. (R. at 508-20.) With respect to her affective disorders, he opined that Plaintiff had a moderate degree of limitation in daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace. (R. at 518.) He noted that her speech was pressured, abstract thinking was limited, persistence and pace were slow, and that she was tearful, anxious, and depressed. (R. at 520.) He also noted that she only associated with her husband and child, and that she did not attend any outside activities. (*Id.*)

On July 2, 2007, non-examining state medical consultant Frederick Cremona, M.D., completed a physical RFC for Plaintiff. (R. at 526-33.) Dr. Cremona opined that Plaintiff was able to perform the exertional requirements of "light work," with only occasional postural limitations. (R. at 527-28.) He also opined that Plaintiff had no manipulative, visual, communicative, or

environmental limitations. (R. at 528-30.)

On January 31, 2008, Plaintiff's treating physician Britt Daniel, M.D., opined that Plaintiff was only able to walk one block, could only sit for 45 minutes at a time, could stand for only 15 minutes at a time, could sit less than 2 hours in an 8 hour day and could stand/walk 2 hours in an 8 hour day. (R. at 561.) Dr. Daniel stated that Plaintiff needed to walk every 45 minutes for 10 minutes and needed a job that permitted shifting positions at will from sitting to standing or walking. (R. at 562.) He also opined that Plaintiff would need to take unscheduled breaks and could never lift more than 10 pounds, twist, stoop, or climb ladders. (R. at 562-63.) He noted that Plaintiff could rarely look down, turn her head right or left, look up, hold her head in a static position, or crouch/squat. (*Id.*) He determined that Plaintiff's impairments lasted or could be expected to last at least 12 months, that anxiety affected her physical condition, and that her pain and other symptoms were frequently severe enough to interfere with the attention and concentration needed to perform simple tasks. (R. at 560-61.) He opined that Plaintiff would miss more than 4 days of work per month based on her impairments and corresponding functional limitations. (R. at 563.)

### 3. Hearing Testimony

On June 4, 2009, Plaintiff, a medical expert ("ME"), and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 23-41.) Plaintiff was represented by her attorney. (R. at 25.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 51 years old, had a high school degree, and was married. (R. at 26-27.) She worked as a dietary clerk at Texoma Medical Center and was a caregiver for her mother. (R. at 27.) Her typical day started with her waking up at 7:00 a.m., driving her daughter to school, and then returning home to lay down and watch TV. (R. at 28.) Because she was unable to walk more than a block at a time, Plaintiff could not walk her daughter the two blocks to school,

so she drove her. (*Id.*) Plaintiff did not help much with household chores, but would occasionally show her husband how to cook something and then lay back down. (*Id.*) This typically only took her about 5 minutes. (*Id.*) She went to the grocery store once every 2 weeks and automatically used a riding cart because she could not walk far without getting tired. (R. at 29.) Her doctors had not told her why she got tired, but she acknowledged having asthma. (*Id.*) She liked music and television and had not taken any recent trips. (*Id.*) Plaintiff acknowledged having a positive test for opiates in July 2005 and attributed it to a drug named Norco that a doctor had prescribed for her head. (R. at 29-30.) She testified that she had a meningioma in 2005, diabetes, high triglycerides, back problems, asthma, severe depression, and anxiety disorder. (R. at 30.)

Plaintiff testified that she became disabled on May 13, 2005, when she had a seizure, was taken to the hospital, and found to have the meningioma. (R. at 30.) The meningioma was removed in 2005, but that did not resolve her problems. (R. at 31.) She still had headaches and could not work because she had depression and anxiety attacks, could only sit for about 45 minutes, could only walk for about a block, and could only stand for about 15 minutes. (*Id.*) She last worked as her mother's paid caregiver from 1996 until her mother's death in 2002. (R. at 32.) Prior to that, she had worked at Texoma Medical Center for seven and a half years as a dietary clerk, where she was primarily responsible for answering telephones and performing some computer work (*Id.*)

Plaintiff acknowledged that this was her fourth application for disability after having been denied on three previous occasions. (R. at 33.) She testified that her situation had not changed since the filing of her earlier applications, and that she filed the fourth application because she disagreed with the previous denials. (R. at 34.)

b. *Medical Expert's Testimony*

Alvin Smith, the medical expert (ME), testified that Plaintiff had a craniotomy to remove a

tumor in 2005 but did not appear to have any significant cognitive residuals after the surgery. (R. at 35.) He noted that a June 28, 2005 mental status examination was normal, memory was intact, there was no dysarthria, and she was coherent. (*Id*.) While she had some disrupted sleep in August 2005, she was not feeling any sadness, anxiety, or extreme apathy in September and October 2005. (*Id*.) In May 2006, she began to get depressed and was placed on an antidepressant. (*Id*.) She was having headaches at the same time her medications were adjusted. (*Id*.)

According to the ME, treatment notes from February 2007 indicated that Plaintiff was doing well on Effexor, Trazodone, and Xanax. (*Id.*) He testified that her cognitive functions were adequate, her memory was good; attention was fair; and insight and judgment were intact. (*Id*.) She had some difficulty with recent memory, and the records he reviewed indicated that Dr. Siegel believed that Plaintiff could have a mood disorder secondary to her craniotomy. (*Id.*)

The ME also testified that Plaintiff's treating physician had identified her main problem as anxiety. (*Id*.) He noted that she had a couple of panic attacks that required attention in an ER but appeared to have stabilized on the medication prescribed by her neurologist. (*Id.*) He did not believe her mental condition was severe enough to meet or equal a listed impairment. (*Id*.) The ME testified that Plaintiff had an anxiety disorder that would prevent her from managing complex task on a sustained basis, but he saw no other limitations. (*Id*.)

c. *Vocational Expert's Testimony*

The VE classified Plaintiff's past relevant work as a diet clerk as sedentary and as a home attendant as medium strength level. (R. at 37.) The ALJ asked the VE to opine whether Plaintiff could perform either of those jobs if she could not perform complex work but was capable of performing detailed work. (R. at 38.) The VE testified that Plaintiff could perform both jobs. (*Id*.) The ALJ asked the VE if occasional postural limitations would limit her ability to do either of those

jobs, and the VE testified that it would not. (*Id.*)

Upon cross-examination by Plaintiff's attorney, the VE testified that a hypothetical claimant with Plaintiff's age and background who was only able to sit for 45 minutes at a time and then needed to walk for 10 minutes at a time could still perform Plaintiff's past relevant work. (R. at 38.) She also testified that the hypothetical claimant would still be able to perform the sedentary work of a diet clerk if she was only able to stand for 15 minutes, but that it might affect the home attendant position depending on the requirements of particular person for which she was caring. (R. at 38-39.) She further testified that a person who could never twist, stoop or climb ladders, rarely crouch or squat, and only occasionally climb stairs, would not be able to work as a home attendant, but could work as a diet clerk. (R. at 39.) She testified that an individual would not be able to maintain employment if she were to miss four or more days person month. (*Id.*) She also testified that the hypothetical person's inability to understand, remember, and carry out short and simple instructions for about 1.2 hours per day could be problematic and might interfere with competitive employment. (R. at 39-40.) Finally, she testified that the individual would not be able to maintain employment if for one day out of the week, she was unable to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*)

C.     **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on December 12, 2008. (R. at 12-20.) At step 1, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2007, and had not engaged in substantial gainful activity since May 13, 2005, the alleged date of onset of disability. (R. at 14.) At step 2, he found that Plaintiff suffered from severe impairments, including diabetes mellitus, hypertension, status post brain surgery, obesity, and a mental impairment primarily identified as an anxiety-related disorder. (*Id.*)

At step 3, the ALJ determined that Plaintiff had no impairment, or combination of impairments that met or equaled the requirements of any listed impairment in the regulations for presumptive disability. (R. at 16.)  The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform a wide range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with occasional postural limitations and the inability to carry out complex tasks. (*Id.*)  At step 4, the ALJ determined that Plaintiff was able to perform her past relevant work as a diet clerk. (R. at 19.)  The ALJ concluded that Plaintiff was not under a disability from May 13, 2005, through the date of the decision. (*Id.*)

## II. ANALYSIS

**A.    Legal Standards**

    **1.    Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, and in the alternative, to remand for further proceedings. (Pl. Br. at 15.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells*

*v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.**     **Issue for Review**

Plaintiff argues that the disability determination was not supported by substantial evidence and was not made pursuant to a proper standard because:

1. The ALJ committed legal error by failing to use the required severity standard set out in *Stone v. Heckler*;

2. The ALJ improperly rejected the treating opinion of Dr. Daniel.

(Pl. Br. at 8, 12.)

**C.**     **De Minimis Standard**

Plaintiff first argues that the ALJ did not apply the required *de minimi*s standard of severity set out in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985), at step two of the sequential evaluation process, and failed to include her back pain, depression, and chronic headaches as severe impairments. (Pl. Br. at 8-12.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of these regulations would be inconsistent with the Social Security Act because they include fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id.*

at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." *Id.* at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, the ALJ cited *Stone* at step 2, but also stated in his decision that an "impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (*See* R. at 13,15-16.) This is the standard set forth in 20 C.F.R. §§ 404.1520(c) and 416.920(c), and one that *Stone* found to be inconsistent with the Social Security Act. *See* 752 F.2d at 1104-05. The ALJ also stated that "an impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (R. at 13.) Under *Stone*, however, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." 752 F.2d at 1101. Unlike the standard set out by the ALJ, *Stone* provides no allowance for a minimal interference with a claimant's ability to work.

Although the ALJ referenced *Stone* in his decision, the Court must look beyond these "magic words" to determine whether he applied the Fifth Circuit's construction of a severe impairment. *Hampton*, 785 F.2d at 1311. The express recitation of a standard inconsistent with the *Stone* standard and the absence of a narrative discussion at step two create an ambiguity as to the whether the correct standard of severity was applied. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (citing *Neal v. Comm'r. of Soc. Sec. Admin.*, No. 3-09-CV-0522-N, 2009 WL 3856662, at *1 (N.D. Tex. Nov. 16. 2009)). Such ambiguity must be resolved at the administrative level, *Neal*, 2009 WL 3856662, at *1, and precludes an immediate award of benefits. *See Wells*, 127 F. App'x at 718.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, the ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error. The Fifth Circuit left the lower courts no discretion to determine whether such an error is harmless. Rather, the court mandated that "[u]nless the correct standard is used, the claim *must* be remanded to the Secretary for reconsideration." *Stone*, 752 F.2d at 1106 (emphasis added). Because the ALJ applied an incorrect standard of severity at step 2, remand is required. Since remand is required for a step 2 error, the Court does not consider the remaining issues for review.

### III. CONCLUSION

*Plaintiff's Motion for Summary Judgment* is **GRANTED**, *Defendant's Motion for Summary Judgment* is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration.

**SO ORDERED, on this 14th day of November, 2011.**

*/s/ Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE